UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRAIG SERAFINO, WALTER TRIPP, and
MICHAEL J. SZYMANSKI, on behalf of
a putative class of similarly situated individuals,

          Plaintiffs,

                              Civil Case No. 14-14112
v.                          Honorable Linda V. Parker

CITY OF HAMTRAMCK and CATHY SQUARE,

          Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

On October 24, 2014, Plaintiffs, retired City of Hamtramck public safety officers, filed this putative class action lawsuit against Defendants City of Hamtramck ("City") and Cathy Square ("Square") (collectively "Defendants").[1] Michigan Governor Rick Snyder appointed Square to serve as the City's Emergency Manager on July 1, 2013, due to the City's financial crisis. Plaintiffs assert that Defendants breached contracts and violated Plaintiffs rights under the

---

[1] Plaintiffs filed a motion for class certification early in the litigation, which the Court denied without prejudice on March 23, 2016. (ECF No. 46.) The Court concluded that fairness and judicial economy dictated that the issue of class certification should be addressed only after the Court resolves the parties' cross-motions for summary judgment, which had been filed while the motion for class certification was pending.

United States Constitution when they made changes to Plaintiffs' retiree health insurance benefits in order to reduce the City's expenses.  Specifically, in an Amended Complaint filed November 12, 2014, Plaintiffs assert the following claims against Defendants: (I) violation of the Contracts Clause, U.S. Const. Art. I, Sec. 10, cl. 1; (II) violation of the procedural Due Process Clause, U.S. Const. Amen. V; (III) violation of the Takings Clause, U.S. Const. Amen. V; (IV) violation of Section 903 of the United States Bankruptcy Code, 11 U.S.C. § 903, and the Supremacy Clause, U.S. Const. art. VI, cl. 2; and (V) breach of contract. Plaintiffs bring their constitutional claims against Defendants pursuant to 28 U.S.C. § 1983.

Presently before the Court are the parties' cross-motions for summary judgment, filed November 19, 2015.[2]  (ECF No. 35, 36.)  The motions have been fully briefed.  Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the reasons that follow, the Court is granting Defendants' motion and denying Plaintiffs' motion.

---

[2] Plaintiffs label their motion as one for "partial" summary judgment because, although they contend they are entitled to summary judgment with respect to all of their claims, they acknowledge that a separate hearing on damages is necessary if they prevail.  (*See* ECF No. 35 at Pg ID 450.)

2

I.      **Summary Judgment Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

Courts evaluate cross motions for summary judgment under the same standard. *La Quinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (citing *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004)). When faced with cross- motions for summary judgment, each motion is examined on its own merits. *Id.*

## II.   Factual and Procedural Background

The City's police officers and firefighters are represented by one of three unions, which have negotiated collective bargaining agreements ("CBAs") with the City throughout the years. (*See, e.g.*, ECF No. 35, Ex. 1.) The CBAs typically are effective for a four-year period. (*Id.*) The CBAs address the terms and condition of employment, including pension benefits and healthcare benefits for retirees. (*Id.*)

In 2010, Plaintiff Michael J. Szymanski ("Szymanksi") retired from the

City's Police Department under a CBA between the City and the Hamtramck

Fraternal Order of Police ("FOP CBA").  (ECF No. 36, Ex. 12 at 15-16; Ex. 13;

*see also* Ex. 9 ¶ 4.)  The cover page and Article XXI of the FOP CBA identify the

contract's duration as "July 1, 2007 through June 30, 2011."  (ECF No. 36, Ex. 13

at Pg ID 1024, 1070.)  With respect to retiree healthcare, the FOP CBA provides in

relevant part the following for retirements effective July 1, 1986:

> The City shall pay in full for the cost of medical, hospital and
> surgical insurance (as more fully described in Section 7(a) above) for
> employees and eligible members of employees' families who retire on
> or after July 1, 1986 until that retired employee attains the age of
> sixty-five (65) or is eligible for [M]edicare or [M]edicaid. . . .

(ECF No. 36, Ex. 13 at Pg ID 1040.)  Section 7(a) of the FOP CBA addresses

medical, hospital, and insurance coverage for active City employees:

> The City shall provide fully paid medical, hospital and surgical
> insurance for all employees covered under this contract and eligible
> members of an employee's family.  The City shall provide continuous
> medical, hospital and surgical insurance coverage equivalent to or
> better than Michigan Blue Cross and Michigan Blue Shield MVFC-2
> coverage with a Master Medical Plan supplemented together with the
> prescription drug rider.

(*Id*. at Pg ID 1037.)

Article XI of the FOP CBA is titled "PENSIONS AND RETIREMENTS[.]"

(*Id*. at Pg ID 1051.)  The first section of Article XI, labelled "Pension Program[,]"

states in part: "Current bargaining unit personnel shall appropriately be subject to

and entitled to a pension and retirement as provided for herein." (*Id*.)  The

remaining section within Article XI, titled "Municipal Employees Retirement

System (MERS)[,]" discusses pension benefit coverage under Michigan's MERS

statute and its amendments, Michigan Compiled Laws § 38.1501 *et seq.* (*Id*.)  No

form of retiree welfare benefits are discussed in Article XI. (*Id*. at 1051-1053.)

In 2011, Plaintiffs Walter Trip ("Trip") and Craig Serafino ("Serafino")

retired from the City's Police Department under a CBA between the City and the

Hamtramck Police Ranking Officer Association ("Association CBA"). (ECF No.

9 ¶¶ 2, 3; ECF No. 36, Ex. 12 at 16, Ex. 14 at 17; Ex. 16.)  The cover page and

Article XX of the Association CBA provide that the duration of the contract is July

1, 2007 to June 30, 2011. (ECF No. 16 at Pg ID 1094, 1114.)

The Association CBA provides full coverage for the cost of hospitalization

for retirees, but does not address retiree medical or surgical insurance:

> The city shall pay in full for the cost of hospitalization for
> employees and their families for persons who retire on or after July 1,
> 1977 until that retired employee attains the age of sixty-five (65) or is
> eligible for Medicare or Medicaid . . .

(*Id*. at Pg ID 1101.)  For employees retiring after July 1, 1990, the Association

CBA does require the City to "provide and pay, the full cost of supplemental

insurance to Medicare, which is equivalent or superior to that offered by and

through Blue Cross/Blue Shield of Michigan." (*Id*.)

6

Like the FOP CBA, the Association CBA contains an article entitled "PENSIONS AND RETIREMENTS."  (*Id.* at Pg ID 1106.)  This article discusses MERS pension benefits.  (*Id.* at Pg ID 1106-1107.)  It does not address any other retiree benefits.  (*Id.*)

The Blue Cross Blue Shield MVFC-2 plan provided to City safety workers under the FOP CBA and Association CBA did not require participants to pay deductibles and required no or very few co-pays.[3]  (ECF No. 35, Ex. 25 ¶ 4.)  At some point in time, the City switched to a different plan with deductibles of $1,250 for single coverage and $2,500 for family coverage.  (*Id.* ¶ 5.)  At the same time, the City started funding Health Savings Accounts ("HSAs") which covered the additional out-of-pocket expenses for active employees and retirees.  (*Id.*) Sometime after 2011, the City changed the health insurance plan to one requiring even higher deductibles; however, the City simultaneously increased the amount it contributed to the HSAs.  (*Id.* ¶ 6.)  In 2012, the City switched to Blue Cross Blue Shield's Simply Blue PPO HSA.  (ECF No. 35, Ex. 3.)  This plan had increased deductibles of $2,000 for single coverage and $4,000 for two person and family coverage.  (*Id.*)  When the City switched to this plan, it again increased its contributions to the HSAs.  (ECF No. 35, Ex. 25 ¶ 6.)

---

[3] The Association CBA provides health insurance coverage under this plan to active employees and their families.  As reflected above, there is no language in the Association CBA requiring the City to provide this coverage, or any general health insurance coverage, to retirees.  (ECF No. 36, Ex. 16 at Pg ID 1100.)

7

On April 17, 2013, a State of Michigan financial review team was appointed to review the City's financial condition.  (ECF No. 36, Ex. 1.)  The review team found that the City had delayed making $2.2 million in required pension contributions in order to manage cash flow, its pension plan had an unfunded actuarial accrued liability of $42.5 million, and its General Operating Fund was operating at a $3.3 million deficit.  (*Id.*, Ex. 2 at Pg ID 910-911.)  The review team concluded that, in accordance with Michigan's Local Financial Stability and Choice Act ("Act"), Mich. Comp. Laws §§ 141.1541-.1575, a local government emergency existed and the appointment of an Emergency Manager under the Act was needed to avoid municipal bankruptcy.  (*Id.*)  Governor Rick Snyder appointed Square as the City's Emergency Manager on July 1, 2013.

In late 2013, Square recommended, among other measures to improve the City's financial condition, temporarily reducing benefits for City retirees and post-65 retirees.  (ECF No. 36, Ex. 3.)  Square sought the City Council's concurrence in these reductions, which the council gave on December 17, 2013.  (*Id.*, Ex. 5.)  In the meantime, on December 9, 2013, Square petitioned the State Treasurer to temporarily modify the healthcare benefits provided for several of the City's bargaining units, which included Plaintiffs.  (*Id.*, Ex. 6.)  The State Treasurer approved the temporary changes on January 27, 2014.  (*Id.*, Ex. 8.)

8

After receiving approval from the City Council and State Treasurer, Square enacted Executive Order S-008.  (*Id*., Ex. 9.)  The Order was executed pursuant to Section 12 of the Act, which grants emergency managers the authority to "make, approve, or disapprove any appropriation, contract, expenditure, or loan" and to "modify, or terminate 1 or more terms and conditions of an existing collective bargaining agreement."  Mich. Comp. Laws § 141.1552(g), (j), (k).  Executive Order S-008 made several changes to existing retiree healthcare: (1) it moved retirees to a higher deductible plan; (2) it moved prescription drug coverage to a different tiered structure, whereby generic drugs maintain the existing co-pay amount but non-generic drugs require a higher copay; and (3) it cancelled the City's contributions to HSAs and Health Reimbursement Arrangements.  (ECF No. 36, Ex. 9.)  These changes went into effect on March 1, 2014.  (*Id*.)

## III.    Applicable Law and Analysis

Plaintiffs' claims in this lawsuit are dependent on whether the relevant CBAs guaranteed them vested retiree healthcare benefits.  The agreements, by their terms, expired in 2011.  Therefore, unless Plaintiffs' welfare benefits vested and thereby continued beyond the duration of the agreements, there was no contract to breach or impair, no property right to take, nor any debt with which to interfere. As such, the first issue the Court must resolve is whether the relevant agreements

conferred vested health insurance benefits on retirees.  If the answer is "no," there
are no other issues for the Court to resolve.

The Michigan courts have found the United States Supreme Court's decision
in *M & G Polymers USA, LLC v. Tackett*, 574 U.S. --, 135 S. Ct. 926 (2015),
"consistent with Michigan's contract jurisprudence regarding CBAs, which applies
with equal force in both public and private sectors."  *Harper Woods Retirees Ass'n
v. City of Harper Woods*, 879 N.W.2d 897, 904-05 (Mich. Ct. App. 2015); *see also
Arbuckle v. Gen. Motors LLC*, -- N.W.2d --, 499 Mich. 521 (2016).  In *Tackett*, the
Supreme Court overruled the long-standing presumption adopted by the Sixth
Circuit Court of Appeals in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (1983), that
retiree benefits provided in a CBA are guaranteed for the lifetime of any employee
who retires under the CBA.  *Tackett*, 135 S. Ct. at 930.  The *Tackett* Court
reiterated "the traditional principle that courts should not construe ambiguous
writings to create lifetime promises."  *Id*. at 936.

In *Tackett*, the Supreme Court instructed courts to interpret CBAs
"according to ordinary principles of contract law."  *Id*. at 933.  The *Tackett* Court
criticized the Sixth Circuit Court of Appeals for "fail[ing] to consider the
traditional principle that 'contractual obligations will cease, in the ordinary course,
upon termination of the bargaining agreement.' "  *Id*. at 937 (quoting *Litton Fin.
Printing Div., Litton Business Sys., Inc. v. NLRB*, 501 U.S. 190, 207 (1991)).  The

10

Court further criticized the court of appeals for "refus[ing] to apply general durational clauses to provisions governing retiree benefits." *Id*. at 936. These general durational clauses, the Sixth Circuit subsequently has instructed, should be considered "in deciding how long a company has committed to provide healthcare benefits to retirees." *Gallo v. Moen, Inc.*, 813 F.3d 265, 268 (2016).

The Supreme Court did not rule out the possibility in *Tackett* that a CBA may provide vested welfare benefits for retirees. As the Court explained:

> That principle [that contractual obligations will cease, in the ordinary course, when the CBA terminates] does not preclude a conclusion that the parties intended to vest lifetime benefits for retirees. Indeed, we have already recognized that "a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration."

135 S. Ct. at 937 (quoting *Litton*, 501 U.S. at 207) (brackets added in *Tackett*). Nevertheless, the Court stated that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id*.

The Sixth Circuit has held that, even where an intent to vest healthcare benefits for retirees is found in the relevant CBA, the employer may modify those benefits if the parties to the agreement "did not perceive the [CBA] as establishing fixed, unalterable benefits." *Reese v. CNH America LLC*, 694 F.3d 681, 684 (6th Cir. 2012). In that instance, an employer "could make 'reasonable' changes to the healthcare plan covering eligible retirees." *Id*. The *Reese* court described

11

"reasonable" alterations as those that are " 'reasonably commensurate' with the old plan," those that "are 'reasonable in light of changes in health care' ", and those that "are 'roughly consistent with the kinds of benefits provided to current employees." *Id*. at 685 (internal quotation marks and citation omitted).  The court provided a non-exhaustive list of questions a court should ask when assessing the reasonableness of the employer's changes to vested retiree health insurance benefits.  *Id*.

Here, Plaintiffs assert several points in support of their contention that their retiree healthcare benefits vested.[4]  First, Plaintiffs point to the provision in the CBAs requiring the City to pay the full cost of health insurance for retirees until the retired employee attains sixty-five years of age.  (ECF No. 35 at Pg ID 477.)  Plaintiffs further point to the promise in the CBAs that retirees will receive coverage under the same healthcare plan as active employees, and the CBAs' statement that coverage for active employees shall be "continuous[.]"  (*Id*.)

As an initial matter, the Association CBA contains absolutely no promise of health insurance coverage-- as opposed to the cost of hospitalization-- for *any*

---

[4] In support of their vesting arguments, Plaintiffs refer to language in CBAs preceding the agreements under which they retired.  The CBAs in effect when Plaintiffs retired, however, are the relevant contracts for deciding whether they were promised vested healthcare benefits in retirement.  Thus for Plaintiffs Serafino and Tripp, the Court must evaluate the language in the Association CBA effective July 1, 2007 to June 30, 2011, and for Plaintiff Szymanski, the Court must focus on the language in the FOP CBA effective for the same dates.

retiree, much less a retiree up to age sixty-five.  With respect to the FOP CBA, the

Sixth Circuit in *Gallo* did not find a promise to pay benefits until a specific age

indicative of an intent to vest.  *See Gallo*, 813 F.3d at 267, 274.  The *Gallo* court

also found the use of the word "continuous" not indicative of an intent to vest

benefits.  *Id*. at 269-70.  As the court explained:

> When a specific provision of the CBA does not include an end date,
> we refer to the general durational clause to determine that provision's
> termination.  *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207,
> 111 S. Ct. 2215, 115 L.Ed.2d 177 (1991).  Absent a longer time limit
> in the context of a specific provision, the general durational clause
> supplies a final phrase to every term in the CBA: "until this agreement
> ends."  *See id.*; *see also Tackett*, 135 S. Ct. at 936.  Reading the
> healthcare provisions in conjunction with the general durational clause
> gives meaning to the phrases "[c]ontinued," "will be provided," "will
> be covered," and the like.  These terms *guarantee* benefits until the
> agreement expires, nothing more.  *See UAW v. Skinner Engine Co.*,
> 188 F.3d 130, 141 (3d Cir. 1999); *Senn v. United Dominion Indus.,
> Inc.*, 951 F.2d 06, 8016 (7th Cir. 1992).

*Gallo*, 813 F.3d at 269 (emphasis and brackets in original).  Thus, as the Seventh

and Eighth Circuits have found, even a promise of coverage "until your death"

provides retirees with lifetime healthcare coverage only during the effective period

of the CBA under which they retired, absent other vesting language.  *Crown Cork

& Seal Co. v. Int'l Assoc. of Machinists and Aerospace Workers*, 501 F.3d 912,

918 (8th Cir. 2007); *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 482-83 (7th Cir.

2006).

In support of their vesting argument, Plaintiffs next point to language in the agreements promising "[f]ull benefits when the member or vested former member has attained 25 years of service, regardless of age." (*See* ECF No. 25 at Pg ID 477.) Plaintiffs are quoting a portion of a provision found in Article XI of the CBAs. In the Association CBA, the full provision reads:

> (c) Employees who retire on or after June 30, 1997 shall receive, in addition to 1(a), (b) above, the following MERS benefit enhancement
>
> "Full benefits when the member or vested member has attained 25 years of service regardless of age and B-4 benefit program retirement allowance pursuant to Section 16 PA 427, 1984 (MCLA 38.1516a)."

(ECF No. 36, Ex. 16 at Pg ID 1106-07.) Similarly, in the FOP CBA, the full provision reads:

> (d) Employees who retire on or after June 30, 1997, shall receive, in addition to 3(a)(1) above,[5] the following MERS benefit enhancements:
>
> (1) Full benefits when the member or vested member has attained 25 years or service, regardless of age.

(ECF No. 36, Ex. 13 at Pg ID 1052.) Plaintiffs maintain that "[f]ull benefits" in these provisions means full pension *and* retiree healthcare. (ECF No. 35 at Pg ID 477.) Plaintiffs therefore contend the CBAs tie eligibility for retiree healthcare to eligibility for a pension. (*Id.*)

---

[5] There is no "3(a)(1) above" in this CBA. The reference appears to have been carried over from earlier CBAs, where 3(a)(1) provided the same language as Section 2(a) of the FOP CBA effective July 1, 2007 through June 30, 2011. (*See, e.g.*, ECF No. 35, Ex. 1 at Pg ID 535-36, 547-48, 577.)

Plaintiffs fail to identify any language in the CBAs suggesting that the reference to "[f]ull benefits" in the above provisions was intended to include retiree healthcare. To the contrary, the agreements' plain language strongly indicates that the term refers to pension benefits, only. These provisions are included in an article of the CBA in which no benefits, other than pension benefits under MERS, are discussed. (*Id.*; Ex. 13 at Pg ID 1051-52.) The statute referenced in Article XI of the Association CBA and FOP CBA-- Michigan's Municipal Employees Retirement Act of 1984-- does not provide for retiree welfare benefits, such as healthcare. *See* Mich. Comp. Laws §§ 38.1501-.1558.

There in fact is no language in the relevant agreements tying pension and retiree health insurance benefits. *Compare Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 583 (6th Cir. 2006) (evaluating the following CBA language and concluding that it ties eligibility for retiree healthcare benefits and pension benefits: " 'Employees who retire under the J.I. Case Pension Plan for Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's pension under the provisions of that plan, will be eligible for the benefits described in this section [i.e., retiree health insurance].' ") In any event, while the Sixth Circuit once found an intent to vest retiree healthcare based on language tying eligibility for those benefits to eligibility for a pension, the *Tackett* Court "rejected this kind of 'tying' analysis as a relic of a misdirected frame of reference, calling it one of many *Yard-*

15

*Man* inferences that was 'inconsistent with ordinary principles of contract law.' "
*Gallo*, 813 F.3d at 272 (quoting *Tackett*, 135 S. Ct. at 937).

Nevertheless, Plaintiffs also contend that an intent to vest can be found in the absence of a durational provision for retiree health insurance benefits, where other provisions contain specific durational clauses. (ECF No. 35 at Pg ID 479.) Specifically, Plaintiffs point to the provision for health insurance coverage following layoff, for which the CBAs provide continued coverage "until the next premium period." (*Id.*) In *Tackett*, however, the Supreme Court expressly rejected the inference Plaintiffs ask this Court to make: that the absence of a specific durational clause for retiree healthcare benefits, in the face of specific limitations elsewhere, reflects an intent to vest those benefits. *See Tackett*, 135 S. Ct. at 936.

Instead, the *Tackett* Court advised that when a specific provision of the CBA does not include an end date, a court must refer to the general durational clause to determine that provision's termination. *Id.* Addressing the Sixth Circuit "refus[al] to apply general durational clauses to provisions governing retiree benefits" and its decisions "requiring a contract to include a specific durational clause for retiree health care benefits to prevent vesting[,]" the Supreme Court stated in *Tackett* that "[t]hese decisions distort the text of the agreement and conflict with the principle of contract law that the written agreement is presumed to encompass the whole agreement of the parties." *Id.* In short, the absence of a durational clause with

16

respect to retiree health insurance-- even in the face of a durational clause for other benefits-- no longer suggests an intent that the duration of retiree health insurance is the life of the retiree.  Instead, it suggests that the parties intended the contract's general durational clause to apply.  *See Gallo*, 813 F.3d at 271-72 ("The CBA's general durational clauses provide a baseline or default rule, a point at which the agreements expire absent more specific limits relevant to a particular term.  In the absence of specific language in the retiree healthcare provisions, the general durational clause controls.").

Plaintiffs next turn to extrinsic evidence to show that the parties intended to vest retiree healthcare benefits.  (ECF No. 35 at Pg ID 480-83.)  However, if there is no ambiguity in the CBAs after applying traditional canons of contract interpretation, there is no basis to examine extrinsic evidence.  *Gallo*, 813 F.3d at 273-74 (citing *Witmer v. Acument Global Techs., Inc.*, 694 F.3d 774, 778 (6th Cir. 2012)); *see also Tackett*, 135 S. Ct. at 938 (Ginsburg, J., concurring) ("When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further.").  There is nothing in the FOP CBA or Association CBA suggesting an intent to extend retiree health insurance benefits beyond the term of those agreements.[6]  As such, the traditional

---

[6] As indicated earlier, in the Association CBA, there is absolutely no promise for retiree healthcare benefits, other than hospitalization coverage.

17

principle applies that " 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.' "

Plaintiffs argue that the Sixth Circuit's prior decisions regarding emergency managers' changes to retiree healthcare demand a different conclusion.  (ECF No. 35 at Pg ID 474-75.)  Specifically, Plaintiffs refer to the Sixth Circuit's decisions in *City of Pontiac Retired Association (PREA) v. Schimmel*, 751 F.3d 427 (2014), and *Welch v. Brown*, 551 F. App'x 804 (2014).  In *Schimmel*, however, the appellate court did not reverse the district court's denial of the plaintiffs' motion for preliminary injunction based on a disagreement as to whether the plaintiffs had a vested right to retiree healthcare benefits.  Instead, the court of appeals indicated that "[t]his issue was not considered thoroughly by the district court" and that it could not "properly assess the retirees' claim without analyzing the collective bargaining agreements in their entireties, which were not before the district court when it considered this issue."  *Id*. at 432.

Similarly, in *Welch*, neither the Sixth Circuit nor the district court analyzed the terms of the relevant CBAs to determine whether the plaintiffs were entitled to vested retiree healthcare benefits.  *See* 551 F. App'x at 810 n.1; *Welch*, 935 F. Supp. 2d 875 (E.D. Mich. 2013).  In fact, the CBAs were not included in the record before the district court or on appeal.  *Welch*, 551 F. App'x at 810 n.1.  Unlike here, the plaintiffs' claims in *Welch* were evaluated at an early stage to assess

18

whether the plaintiffs were entitled to a preliminary injunction, and the courts appear to have accepted as true the plaintiffs' allegation that the defendants' alteration of retiree health insurance benefits interfered with an existing right. *See id.* at 805. Notably, it is not evident from the trial or appellate courts' decisions in *Welch* whether the CBAs at issue had even expired when the emergency manager made the challenged changes. *See, e.g., id.* at 805 ("Plaintiffs challenge several orders the Emergency Manager issued, which modified *existing* contracts and collective bargaining agreements with respect to health-care benefits of municipal retirees.").

The CBAs had expired when Square instituted the changes to retiree health insurance coverage that are the subject of this lawsuit. Because those benefits did not vest, Plaintiffs no longer had a contractual right to their receipt. Plaintiffs' breach of contract claim therefore fails. Plaintiffs' claim alleging a violation of their rights under the Contract Clause likewise fails because, to prove a violation, Plaintiffs must show "that a 'change in state law has operated as a substantial impairment of a contractual relationship.' " *Mascio v. Pub. Employees Ret. System of Ohio*, 160 F.3d 310, 313 (6th Cir. 1998) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)) (additional quotation marks and citation omitted).

19

Similarly, to prove their claims under the Due Process Clause or Takings Clause, Plaintiffs must demonstrate that they were deprived of a protected property interest. *Richardson v. Twp. of Brady*, 218 F.3d 508, 517 (6th Cir. 2000) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569577 (1972); *Puckett v. Lexington-Fayette Urban Cnty. Gov't*, -- F.3d --, 2016 WL 4269802, at *12 (6th Cir. 2016) (citing *Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 481 (6th Cir. 2004)). Plaintiffs rely on the CBAs as the source of their property interest. (ECF No. 35 at Pg ID 490-91.) Having found that the CBAs did not create a promise for retiree healthcare benefits beyond the term of the CBAs, and because the CBAs expired, Plaintiffs "cannot rely on [the CBAs] as a source of their protected interest." *Ash v. Bd. of Ed. of the Woodhaven Sch. Dist.*, 699 F.2d 822, 825-27 (6th Cir. 1983) (citations omitted). Plaintiffs' due process and takings claims therefore fail.

Finally, Plaintiffs allege that Section 903 of the U.S. Bankruptcy Code and the Constitution's Supremacy Clause preempt Square's actions to modify retiree healthcare. Plaintiffs' claim is dependent on a finding that the City owed a debt in the form of healthcare benefits to retirees. Having decided otherwise, the Court concludes that this claim also fails.

20

In short, because the Court concludes that Plaintiffs did not have a vested right to health insurance benefits in retirement, Defendants are entitled to summary judgment with respect to their claims.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for partial summary judgment (ECF No. 35) is **DENIED**;

**IT IS ORDERED** that Defendants' motion for summary judgment (ECF No. 36) is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 27, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, September 27, 2016, by electronic and/or U.S. First Class mail.

s/ Richard Loury
Case Manager
