# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: September 01, 2017

Mr. John C. Clark
Mr. Stephen J. Hitchcock
John Travis Mihelick
Giarmarco, Mullins & Horton
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084

Mr. Robert D. Fetter
Mr. Keith D. Flynn
Miller Cohen
600 W. Lafayette Boulevard, Fourth Floor
Detroit, MI 48226

Mr. Brian M. Schwartz
Mr. Richard W. Warren Jr.
Miller Canfield Paddock & Stone
150 W. Jefferson Avenue, Suite 2500
Detroit, MI 48226

Re: Case No. 16-2370, *Craig Serafino, et al v. City of Hamtramck, et al*
Originating Case No. : 4:14-cv-14112

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Sincerely yours,

s/Cathryn Lovely for Renee Jefferies
Case Manager
Direct Dial No. 513-564-7021

cc: Mr. David J. Weaver

Enclosure

Mandate to issue

<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name:  17a0512n.06

No. 16-2370

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CRAIG SERAFINO, WALTER TRIPP, and MICHAEL J. SZYMANSKI, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE EASTERN DISTRICT OF |
| CITY OF HAMTRAMCK, MICHIGAN and CATHY SQUARE, | ) ) ) | MICHIGAN |
| Defendants-Appellees. | ) | |

```
                                    ┌─────────────────────────┐
                                    │         FILED           │
                                    │     Sep 01, 2017        │
                                    │ DEBORAH S. HUNT, Clerk  │
                                    └─────────────────────────┘
```

BEFORE:  BATCHELDER, GIBBONS, and COOK, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**  The state of Michigan appointed an emergency manager for the City of Hamtramck ("the City") because the City was facing a fiscal crisis.  To shore up the City's financial situation, the emergency manager, among other things, altered the health-insurance plans offered to plaintiffs, retired Hamtramck police officers and firefighters.  Under the new plans, the City continued to pay the plaintiffs-retirees' health-insurance premiums, but required greater deductibles and co-pays.  Believing that these changes violated the promises contained in certain collective-bargaining agreements ("CBAs"), plaintiffs sued Hamtramck and Emergency Manager Cathy Square.

The district court dismissed plaintiffs' breach-of-contract claims because it found that the relevant CBAs did not create a vested right to lifetime healthcare benefits.  Because each of plaintiffs' constitutional claims required some property interest, that finding resulted in the failure of all of plaintiffs' constitutional claims as well.  Plaintiffs appealed.

No. 16-2370, *Serafino v. City of Hamtramck*

The district court was correct: the CBAs do not create a vested right to lifetime healthcare benefits. From the four corners of the CBAs, there is no indication that the parties intended for retiree healthcare to vest for life; instead, each CBA contains a general-durational clause that explicitly limits the duration of plaintiffs' rights under the contracts. We affirm.

## I.

Plaintiffs claim that their contractual and constitutional rights were infringed when the City and Square took action to contain the City's fiscal crisis. Some of these actions pertained to retiree healthcare under prior CBAs that plaintiffs allege created vested, lifetime rights to healthcare under specific terms.

## A.

At issue in this appeal are three separate groups of plaintiffs: (1) police officers who retired under the Fraternal Order of Police ("FOP") CBA; (2) police officers who retired under the Ranking Officers Association ("ROA") CBA; and (3) firefighters who retired under the International Association of Firefighters ("IAF") CBA. All retirees retired on or after July 1, 1986. The pertinent details of each CBA will be addressed in turn.

*Fraternal Order of Police CBA*. The City and the Hamtramck FOP have entered into a series of CBAs, dating back to at least the 1990s. Relevant here is the CBA effective as of July 1, 2007 ("2007 FOP CBA"). In Article VII, titled "Economic Matters," that CBA provided the following related to plaintiff-retiree healthcare:

> The City shall pay in full for the cost of medical, hospital, and surgical insurance (as more fully described in Section 7(a) [the provision for active employee healthcare insurance]) for employees and eligible members of employees' families who retire on or after July 1, 1986 until that retired employee attains the age of sixty-five (65) or is eligible for [M]edicare or [M]edicaid.

No. 16-2370, *Serafino v. City of Hamtramck*

DE 36-14, Page ID 1033, 1040. The insurance available to retirees was to mimic the healthcare insurance available to active employees. Active-employee healthcare insurance was contained in Article VII, § 7(a) of the 2007 FOP CBA, which provides:

> The City shall provide fully paid medical, hospital and surgical insurance for all employees covered under this contract and eligible members of an employee's family. The City shall provide continuous medical, hospital and surgical insurance coverage equivalent to or better than Michigan Blue Cross and Michigan Blue Shield MVFC-2 coverage with a Master Medical Plan supplemented together with the prescription drug rider.

*Id*. at 1037.

The 2007 FOP CBA did not extend indefinitely. Instead, it contained a general-durational clause, which stated that the "agreement shall be effective as of the first day of July 1, 2007, and shall remain in full force and effect to and including the 30th day of June, 2011." *Id*. at 1070. Article XXI also required the parties to begin negotiations for a new agreement no later than April 15, 2011. Another section governed the duration of the agreement in the event a new CBA was not entered into by June 30, stating:

> In the event that negotiations extend beyond the 30th day of June, 2011, the terms and provisions of this Agreement shall remain in full force and effect pending agreement upon a new contract. Any additional benefits or increases in wages obtained as a result of negotiations after the expiration of this Agreement shall be retroactive to the 1st day of July, 2011.

*Id*. It appears that the City and the FOP did not enter into a new agreement until July 1, 2014.

*Ranking Officers Association CBA*. The relevant ROA CBA was entered into on July 1, 2007. Its provisions for retiree healthcare differed materially from those contained in the 2007 FOP CBA. Specifically, Article VII, § 8 of the 2007 ROA CBA stated that "[t]he city shall pay in full for the *cost of hospitalization* for employees and their families for persons who retire on or after July 1, 1977 until that retired employee attains the age of sixty-five (65) or is eligible for Medicare or Medicaid." DE 44-4, Page ID 1267 (emphasis added). For those employees who

3

No. 16-2370, *Serafino v. City of Hamtramck*

retired after July 1, 1990, the City promised to pay for the "full cost of supplemental insurance to Medicare, which is equivalent or superior to that offered by and through Blue Cross/Blue Shield of Michigan." *Id*.

Similar to the 2007 FOP CBA, the 2007 ROA CBA contained a general-durational clause, which provided that "[t]he duration of this contract, both as to economic and non-economic provisions[,] shall run from July 1, 2007 to June 30, 2011." *Id*. at 1280. And, like the 2007 FOP CBA, the 2007 ROA CBA provided for the extension of the agreement until the parties entered into a new agreement. The ROA and the City reached a new agreement on July 1, 2014.

*International Association of Firefighters CBA*. The relevant IAF CBA was entered into on July 1, 2009. The retiree-healthcare provisions in the IAF CBA closely mirrored the 2007 FOP CBA, and provide, for those retirees who retire after July 1, 1986, that "[t]he City shall pay in full the cost of medical insurance [as described in § 6(a)] and Master Medical insurance . . . until that employee attains the age of sixty-five (65) or is eligible for Medicare or Medicaid." DE 35-2, Page ID 564. Section 6(a) of the 2009 IAF CBA provided that:

> The City shall provide fully paid medical and prescription drug insurance for all employees covered under this contract and eligible members of an employee's family. The City shall provide continuous medical insurance coverage equivalent to, or better than, Michigan Blue Cross and Blue Shield MVF-2 coverage with a Master Medical Plan.

*Id*. at 562. In addition, for those employees retiring after July 1, 1989, the City agreed to pay for the cost of a Medicare supplemental insurance plan "equivalent or superior to that offered through Blue Cross-Blue Shield of Michigan." *Id*. at 564–65.

Like the other CBAs at issue, the 2009 IAF CBA contained a general-durational clause, which provided that "[t]he duration of this contract, both as to economic and non-economic

4

No. 16-2370, *Serafino v. City of Hamtramck*

provisions, shall run from July 1, 2009 through June 30, 2014." *Id.* at 568. And, just as the 2007 FOP and ROA CBAs, the 2009 IAF CBA provided for its extension should the parties not reach a new agreement before it expired. Unlike the FOP and ROA agreements, however, it appears the IAF agreement ended prematurely. IAF and the City entered into a new CBA with a stated duration from November 23, 2013, through June 30, 2016.

## B.

Since the Great Recession, many Michigan municipalities have struggled to avoid bankruptcy. *See Phillips v. Snyder*, 836 F.3d 707, 711 (6th Cir. 2016) (listing several municipalities that have been assigned emergency managers, including Hamtramck, Highland Park, Flint, Pontiac, Ecorse, Benton Harbor, and Village of Three Oaks). "When the finances of a Michigan municipality or public school system are in jeopardy, a state law allows for the temporary appointment of an emergency manager to right the ship." *Id.* at 710. That state law, as currently embodied, is known as the Local Financial Stability and Choice Act, and was enacted as Public Act 436 (PA 436). *Id.* at 711 (citing Mich. Comp. Laws § 141.1549).

PA 436 provides for the appointment of emergency managers who exercise the power of the local government. *Id.* (citing Mich. Comp. Laws § 141.1549(2)). At the governor's discretion, PA 436 permits the state treasurer to oversee the actions of the emergency manager. *Id.* (citing Mich. Comp. Laws § 141.1549(8)).

Our decision in *Phillips v. Snyder* detailed the process for appointing an emergency manager under PA 436:

> There are eighteen scenarios contained in PA 436 that act as triggers for the statute. If one of those scenarios occurs, the "state financial authority" (the state treasurer for a municipality, or the superintendent of public education for a school district) conducts a preliminary review to determine whether a given entity is under "probable financial stress." The financial authority then turns its final report over to a local emergency financial assistance loan board, which is a

No. 16-2370, *Serafino v. City of Hamtramck*

        statutory entity established by § 141.932. This board reviews the authority's report and makes an official finding of either probable financial stress or no financial stress. If the board reaches a conclusion of probable financial stress for an entity, the governor appoints a "review team." Within sixty days of a review team's appointment, it must turn in a report to the governor that reaches a conclusion on whether a financial emergency exists within the reviewed local government. Within ten days after receiving the review team's report, the governor determines whether a financial emergency exists or not. A local government is provided an opportunity to appeal this determination to the Michigan court of claims.

        A local government has four options when confronted with a finding of a financial emergency: the local government can (1) enter into a consent agreement with the state treasurer; (2) accept the appointment of an emergency manager; (3) undergo a neutral evaluation process, which is akin to arbitration, with its creditors; or (4) enter into Chapter 9 bankruptcy.

*Id*. at 711–12 (internal citations omitted).

        On April 17, 2013, the State of Michigan appointed a financial review team to review the City's financial condition. Approximately a month later, the review team issued its report. It determined that a "financial emergency" existed in Hamtramck, and noted that "there was essentially unanimous acknowledgement from every City and union official with whom the Review Team met that a financial emergency exists within the City of Hamtramck." DE 36-2, Page ID 899.

        Cathy Square was appointed emergency manager for the City. She proposed various budgetary changes designed to prevent the City from becoming insolvent, among which were changes to retiree healthcare. The parties agree that plaintiffs originally had retiree-healthcare plans under which they had no deductible and very low co-pays. Those plans became unavailable, however, and the City moved retirees to new plans that had deductibles and higher co-pays. To offset these increased costs, the City provided the retirees with health-savings accounts ("HSAs") that covered the costs of the deductibles. Square's proposed changes to the retirees' healthcare included removing these HSAs and covering retirees, instead, under a "Blue

No. 16-2370, *Serafino v. City of Hamtramck*

Care Network" plan with a $2,000 deductible for single insureds and a $4,000 deductible for family insureds. This new plan was essentially the same, from a deductible and co-pay perspective, as the plan that previously governed retirees' health benefits. The only difference was that retirees, rather than the City, had to cover the costs of their deductibles. Importantly, the City continued to pay all of the retirees' health-insurance premiums. The City concurred in all of Square's proposed changes to retiree healthcare, and Square implemented the changes on January 29, 2014.

## C.

The retirees did not agree with these changes to their healthcare and brought a putative class-action lawsuit against the City and Square on October 24, 2014. Their complaint, as amended, alleged five causes of action: three separate counts under 42 U.S.C. § 1983 for violations of the Constitution's (1) Contracts Clause, (2) Takings Clause, and (3) Due Process Clause; (4) a violation of the Bankruptcy Code, 11 U.S.C. § 903; and (5) a breach-of-contract action under Michigan law.

On cross-motions for summary judgment, the district court dismissed all of plaintiffs' claims. It did so because it found that plaintiffs could not demonstrate a vested, lifetime right to health-insurance benefits. Because their rights had not vested, the district court concluded that any changes to those rights were not protected by contract. This holding defeated not only plaintiffs' breach-of-contract claims, but also their remaining claims because each required a protected property interest or some form of debt to be viable. Accordingly, because it found that plaintiffs had no contractual right to healthcare benefits, the district court did not reach the merits of plaintiffs' constitutional or bankruptcy-law claims. Plaintiffs appealed.

No. 16-2370, *Serafino v. City of Hamtramck*

## II.

We review the district court's grant of summary judgment *de novo*. *Domingo v. Kowalski*, 810 F.3d 403, 410 (6th Cir. 2016) (citing *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 542 (6th Cir. 2014)). Construing the evidence in the light most favorable to the nonmovant, *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

## III.

Unless plaintiffs can demonstrate a vested right to lifetime healthcare benefits prior to the expiration of their respective CBAs, their claims fail.[1] This is so because the 2009 CBAs and the contractual rights contained in them expired when they were replaced by new CBAs. Plaintiffs do not allege that the City's or Square's actions violated the 2013 IAF CBA or the 2014 FOP and ROA CBAs. Thus, unless their contractual rights vested and survived the expiration of the earlier agreements, plaintiffs' claims must fail because, as the district court held, they had no contractual rights to breach and, concomitantly, no property rights from which they could derive any of their constitutional or bankruptcy-law claims.

## A.

---

[1] The district court found that plaintiffs did not have a vested right to lifetime healthcare benefits. Its inquiry was focused on lifetime vesting because that was the nature of the right that plaintiffs asserted. The district court correctly found that plaintiffs' healthcare rights did not vest for life. It erred, however, in holding that "[t]he agreements, by their terms, expired in 2011" and that, accordingly, "there was no contract to breach or impair." DE 51, Page ID 2009. The 2007 FOP CBA and 2007 ROA CBA both contained provisions that extended their effective date past June 30, 2011, if the unions and the City had not reached an agreement. Here, new FOP and ROA CBAs did not take effect until July 1, 2014, meaning that, when Square and the City made changes to retiree healthcare under those CBAs in January 2014, the FOP and ROA retirees had some contractual rights remaining under those CBAs. But plaintiffs placed all of their eggs in the lifetime-vesting basket. They have focused, exclusively, on the alleged lifetime nature of their rights. Plaintiffs have not argued in the alternative that their rights under the 2007 CBAs, which expired on June 30, 2014, were breached, albeit temporarily, by the City and Square's changes to their healthcare benefits. In fact, plaintiffs argued that Square's actions were illegal, in part, because Michigan law grants her the authority to alter only *existing* CBAs and that the CBAs under which they claim rights were not in existence at the time of her changes. Thus, just as the parties and the district court have, we focus our inquiry on whether the relevant CBAs evince an intent to vest plaintiffs' healthcare benefits for life.

No. 16-2370, *Serafino v. City of Hamtramck*

The issue of whether retirees have vested rights to lifetime healthcare benefits is an active one in this circuit. The flurry of cases stems from the Supreme Court's recent invalidation of the Sixth Circuit's so-called *Yard-Man* inference. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 930 (2015).

*Tackett* held that ordinary principles of contract interpretation should apply to collective-bargaining agreements. *Id*. at 935. Most courts in the country had always done so. *See Noe v. PolyOne Corp.*, 520 F.3d 548, 567–68 (6th Cir. 2008) (Sutton, J., concurring in part and dissenting in part). The Sixth Circuit, however, had reviewed collective-bargaining agreements "with a thumb on the scale in favor of employees." *Reese v. CNH Indus. N.V.*, 854 F.3d 877, 880 (6th Cir. 2017) (*Reese III*) (citing *Tackett*, 135 S. Ct. at 935). This favoritism derived from a doctrine known most commonly as the *Yard-Man* inference. *Id*. "In *Tackett*, the Supreme Court abrogated the *Yard-Man* inference and instructed courts to apply 'ordinary principles of contract law' when reviewing collective-bargaining agreements." *Id*. at 881.

The Supreme Court also provided a refresher course on contract law. It noted that, when interpreting CBAs, "as with any other contract, the parties' intentions control." *Tackett*, 135 S. Ct. at 933 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). Further, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id*. (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)). *Tackett* noted that any assumption "in favor of vested retiree benefits in all collective-bargaining agreements" rests on "assessment[s] of likely behavior" between the parties that "is too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention." *Id*. at 935. Indeed, "[p]arties . . . can and do voluntarily agree to make retiree benefits a subject of

9

mandatory collective bargaining," and they do so despite unions representing only active employees and not retirees. *Id*. at 936.

The Supreme Court instructed courts "not [to] construe ambiguous writings to create lifetime promises." *Id*. (citing 3 A. Corbin, Corbin on Contracts § 553, p. 216 (1960) (explaining that contracts that are silent as to their duration will ordinarily be treated not as "operative in perpetuity" but instead as "operative for a reasonable time")). And, like other contracts, the obligations under collective-bargaining agreements "cease, in the ordinary course, upon termination of the bargaining agreement." *Id*. at 937 (quoting *Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 207 (1991)).

Although a contract's general-durational clause does not say everything about the parties' intent to vest a benefit, *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 209 (6th Cir. 2016) (*Tackett III*), it certainly says a lot. So, "[w]hen a specific provision of the CBA does not include an end date, [this court] refer[s] to the general durational clause to determine that provision's termination." *Gallo v. Moen, Inc.*, 813 F.3d 265, 269 (6th Cir. 2016). Absent some strong indication within the four corners of the agreement itself—perhaps, a specific-durational clause that applied to certain provisions but not others—the contractual rights and obligations under a CBA terminate along with the CBA. *Tackett*, 135 S. Ct. at 937.

We have, on occasion, found that a general-durational clause did not unambiguously apply to certain benefits contained within a CBA. Generally, we have done so where some other durational language cast doubt on a general-durational clause's otherwise-unequivocal province. In *Reese III*, we found that a CBA's general-durational clause did not unambiguously prevent vesting because the parties had "carved out certain benefits, such as life insurance and healthcare insurance, and stated that those coverages ceased at a time different than other provisions of the

10

No. 16-2370, *Serafino v. City of Hamtramck*

CBA." 854 F.3d at 882. Similarly, in *UAW v. Kelsey-Hayes Co.*, we found that, where certain healthcare benefits were time limited but others were not, language noting that those benefits "continued" created an ambiguity about the duration of the employer's promise. 854 F.3d 862, 867 (6th Cir. 2017). Yet, merely having a CBA that contains "phrases [such as] 'continued,' 'will be provided,' 'will be covered,' and the like" tells us only that the terms are "*guarantee*[*d*] benefits until the agreement expires, nothing more." *Gallo*, 813 F.3d at 269 (citations omitted). Thus, "[a]bsent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'" *Id.*

Of course, *Tackett* arose in a different context than the claims presented here. Specifically, those cases were brought under ERISA, which governs the relationships and agreements between private employers and their employees but excludes public employers and employees, like plaintiffs here. *See* 29 U.S.C. § 1003(b)(1). Thus, what rights exist under these CBAs is determined by Michigan contract law. Yet, despite the different setting, Michigan courts have unanimously endorsed *Tackett*'s reasoning in both the private- and public-sector context. *See Arbuckle v. Gen. Motors LLC*, 885 N.W.2d 232, 242–43 (Mich. 2016) (applying *Tackett*'s reasoning in interpreting a CBA under ERISA); *Harper Woods Retirees Ass'n v. City of Harper Woods*, 879 N.W.2d 897, 904–05 (Mich. Ct. App. 2015) (noting that *Tackett*'s reasoning is "consistent with Michigan's contract jurisprudence regarding CBAs, which applies with equal force in both the public and private sectors"). Thus, we are free to look to *Tackett* and its progeny in interpreting the CBAs at issue here.

### B.

All of the CBAs at issue in this appeal contain unambiguous general-durational clauses that defeat plaintiffs' argument that they have vested, lifetime rights to healthcare benefits.

11

No. 16-2370, *Serafino v. City of Hamtramck*

Looking to the four corners of the agreements, there is no indication that the City intended to provide *any* healthcare benefit to the retirees for life, let alone a right to deductible-free, low-co-pay, forever-unalterable healthcare insurance.

### 1. 2007 FOP CBA

The 2007 FOP CBA contained a general-durational clause, providing that the agreement terminated on June 30, 2011, or, if a new CBA had not been reached by then, when a new CBA came into effect. Because a new agreement was reached on July 1, 2014, the 2007 FOP CBA needs to contain some indication that plaintiffs' healthcare benefits were excepted from this general-durational clause. "*First and foremost*, nothing in this or any of the other CBAs says that [the City] committed to provide unalterable healthcare benefits to retirees" for life. *Gallo*, 813 F.3d at 269. Further, unlike in *Reese III* and *Kelsey-Hayes*, there is no ambiguity as to this general-durational clause's application to the retirees' healthcare benefits. As noted above, the CBA in *Reese III* carved out health insurance as a benefit that ended at a different time than other benefits, rendering the duration of that benefit ambiguous. *See* 854 F.3d at 882. Similarly, the CBA at issue in *Kelsey-Hayes* "use[d] . . . three different types of durational language for specific provisions within the agreement," which furthered the ambiguity. *See* 854 F.3d at 872. No such provisions are present in this CBA.

Other language in the 2007 FOP CBA belies vesting. For example, the 2007 FOP CBA's Art. VII, § 8(c)—the retiree-healthcare-benefit provision at issue here—governs retirement benefits for former employees who retired on or after July 1, 1986—a group that obviously includes retirees who retired under pre-2007 CBAs. But, since each successive FOP CBA has contained substantially similar language regarding retiree healthcare, that raises the question: if anyone—the FOP, the retirees, or the City—believed that the retirees' rights had vested, why

No. 16-2370, *Serafino v. City of Hamtramck*

would their healthcare benefits be included in a 2007 CBA?  The only reasonable inference, of course, is that the parties did not believe this language created a vested right to lifetime healthcare benefits and thus had to include it in each new CBA.  Indeed, "[t]here would be no need to continue such benefits if prior CBAs had created vested rights to such benefits."  *See Gallo*, 813 F.3d at 270 (internal quotation marks omitted).  This reinforces the general-durational clause's application and provides further evidence that the parties did not intend to vest retiree healthcare benefits for life.[2]

Plaintiffs argue that phrases such as "until that retired employee attains the age of sixty-five," "shall be eligible for," and "continuous" indicate an intent to vest benefits for life.  *See* CA 6 R. 27, at 22–30.  And notably, plaintiffs claim the healthcare provision "does not read 'until they reach age 65 or are eligible for Medicare or Medicaid *OR UNTIL THE EXPIRATION OF THIS AGREEMENT* WHICHEVER IS SOONER.'"  *Id.* at 23.  But that is exactly how it reads because, unless there is "a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'"  *Gallo*, 813 F.3d at 269.

---

[2] Although outside the four corners of the agreement and thus irrelevant to the vesting analysis, plaintiffs' own complaint provides some acknowledgement of the non-vested nature of the retirees' healthcare benefits.  They agree that the City made changes to their healthcare but claim that "[t]hese changes were not challenged because the retirees determined that they were equivalent or better than the plan referenced in the contracts or were too insignificant to warrant substantial litigation."  DE 9, Page ID 45.  But that is not the way vesting works.  When a retiree's rights vest, those rights become forever unalterable.  *Arbuckle*, 885 N.W.2d at 241.  This differentiates non-vested retiree benefits, which unions, though they represent only current employees and not retirees, are permitted to make part of their negotiations.  *See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pitt. Plate Glass Co., Chem. Div.*, 404 U.S. 157, 181–82, 181 n.20 (1971); *see also Arbuckle*, 885 N.W.2d at 241 ("[A] union may represent and bargain for already-retired employees, but only with respect to *non*vested benefits.  By contrast, when an employer explicitly obligates itself to provide vested benefits, that promise is rendered forever unalterable without the retiree's consent."); *Kendzierski v. Macomb Cty.*, --N.W.2d--, No. 329576, 2017 WL 1398769, at *2–3 (Mich. Ct. App. Apr. 18, 2017) (applying *Arbuckle* in the public-union context).  Here, retirees benefited from the FOP's continued successful negotiations for their retirement benefits, and that is why they did not object to the changes.  Now that those benefits' non-vested nature has worked to the retirees' detriment, the retirees cannot claim that their rights are, and have been, forever unalterable.

No. 16-2370, *Serafino v. City of Hamtramck*

Further, plaintiffs contend that the tying of healthcare benefits to retiree status indicates an intention to vest those benefits. The Supreme Court, however, has limited courts' ability to rely on tying as evidence of vesting. *See Tackett*, 135 S. Ct. at 937. True, post-*Tackett*, we have determined that tying may further an ambiguity. *See Reese III*, 854 F.3d at 882–83 (finding that tying of healthcare benefits to pensioner status, when coupled with silence and confusion about the duration of healthcare benefits, rendered a CBA ambiguous). But, again, the CBAs in that case contained separate durational clauses coupled with evidence of tying. *See id*. The 2007 FOP CBA is not silent as to duration and does not contain conflicting durational clauses. As such, evidence of tying cannot create an ambiguity where none would otherwise exist. Accordingly, the general-durational clause controls and plaintiffs' rights did not vest.

## 2. 2007 ROA CBA

The 2007 ROA CBA in many ways mirrors the 2007 FOP CBA. Like the 2007 FOP CBA, it contains a general-durational clause. And, also like the 2007 FOP CBA, it lacks any ambiguity as to that provision's application to retiree-healthcare benefits. Accordingly, the above analysis applies with equal force to the 2007 ROA CBA and similarly precludes a finding of vested benefits.

The 2007 ROA CBA, however, does contain an important distinction: it does not provide for retiree healthcare insurance at all. Instead, it covers only the "full . . . cost of *hospitalization* for employees and their families for persons who retire on or after July 1, 1977." DE 44-4, Page ID 1267 (emphasis added). And, for those employees who retire after July 1, 1990, it provides for supplemental insurance to Medicare. Thus, even assuming that those plaintiffs covered by the 2007 ROA CBA had vested rights, the City's changes to their healthcare would not infringe

14

No. 16-2370, *Serafino v. City of Hamtramck*

plaintiffs' rights at all.  In fact, it appears the City has been providing them with greater benefits than those to which they are entitled and that the City, even after the changes, continues to do so.

### 3. 2009 IAF CBA

As with the other CBAs at issue here, the 2009 IAF CBA's general-durational clause precludes a finding that the retirees' rights vested.  The 2009 IAF CBA is nearly identical to the 2007 FOP CBA and likewise lacks sufficient evidence to overcome the general-durational clause's force.  That clause, which provides that "[t]he duration of this contract, both as to economic and non-economic provisions, shall run from July 1, 2009 through June 30, 2014," DE 35-2, Page ID 568, supplies the final phrase to the retiree-healthcare-benefits provision contained in the 2009 IAF CBA: "until this agreement ends."  *See Gallo*, 813 F.3d at 269.

***

It is important to remember the equities at issue here.  No one, of course, wants to see cuts to retiree healthcare.  But these retirees are still receiving premium-free healthcare insurance.  And even if we found that the retirees had vested rights to healthcare insurance, the City's changes likely do not infringe those rights.  After all, the CBAs, at best, promise to pay for the "full . . . cost of medical insurance."  *See* DE 35-2, Page ID 564.  As commonly understood, the "cost" of an insurance plan is the premium paid by the insured, which the City continues to cover.

### IV.

For the above reasons, we affirm the district court's grant of summary judgment for defendants.